# 25-_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Respondent,*

–v.–

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants-Petitioners.*

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:23-cv-4738-KPF) (Hon. Katherine Polk Failla)

## PETITION FOR PERMISSION TO APPEAL
## PURSUANT TO 28 U.S.C. § 1292(b)

William Savitt
Kevin S. Schwartz
Sarah K. Eddy
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

Jeffrey B. Wall
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500

Steven R. Peikin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners Coinbase, Inc. and Coinbase Global, Inc. state as follows:

Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global, Inc.

Coinbase Global, Inc. is a publicly held corporation and does not have any parent corporation. To the best of Coinbase Global's knowledge, no publicly held corporation owns 10% or more of Coinbase Global's stock.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT....................................................i

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION ..................................................4

STATEMENT OF THE ISSUE ...........................................................5

STATEMENT OF THE CASE .............................................................5

ARGUMENT ........................................................................................7

A.    Whether Digital-Asset Transactions In The Secondary Market Are Investment Contracts Is A Controlling Question Of Law.......................8

    1.    The question presented is purely legal...........................................8

    2.    The question presented is controlling ...........................................11

B.    Whether Digital-Asset Transactions In The Secondary Market Are Investment Contracts Provides Substantial Ground For Difference Of Opinion....................................................................................13

    1.    The question has divided several district courts ..........................13

    2.    The question is particularly difficult and of first impression.......16

C.    An Immediate Appeal May Materially Advance the Litigation ............19

CONCLUSION ...................................................................................24

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re A2P SMS Antitrust Litig.*,
  2015 WL 876456 (S.D.N.Y. March 2, 2015)......................................................8

*Axon Enter.* v. *FTC*,
  598 U.S. 175 (2023)...........................................................................................23

*Biden* v. *Nebraska*,
  143 S. Ct. 2355 (2023) ......................................................................................19

*Capitol Records, LLC* v. *Vimeo, LLC*,
  972 F. Supp. 2d 537 (S.D.N.Y. 2013).........................................16, 17, 19, 20

*Coinbase* v. *SEC*,
  __ F. 4th __, 2025 WL 78330 (3rd Cir. Jan. 13, 2025) .......................2, 15, 19

*Dev. Specialists, Inc.* v. *Akin Gump Strauss Hauer & Feld LLP*,
  2012 WL 2952929 (S.D.N.Y. July 18, 2012) ...................................................12

*In re Duplan Corp.*,
  591 F.2d 139 (2d Cir. 1978) ..............................................................................11

*Dupree* v. *Younger*,
  598 U.S. 729 (2023)..............................................................................................8

*In re Enron Corp.*,
  2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007) ..................................................13

*FHFA* v. *UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012)..............................................................21

*Hart* v. *Rick's Cabaret Int'l, Inc.*,
  73 F. Supp. 3d 382 (S.D.N.Y. 2014)................................................................11

*Kasiotis* v. *New York Black Car Operators' Inj. Comp. Fund, Inc.*,
  90 F.4th 95 (2d Cir. 2024)...................................................................................9

*Klinghoffer* v. *S.N.C. Achille Lauro,*
   921 F.2d 21 (2d Cir. 1990) ................................................................11

*Loper Bright Enterprises* v. *Raimondo,*
   603 U.S. 369 (2024)....................................................................9, 23

*Moody* v. *NetChoice, LLC,*
   603 U.S. 707 (2024)..........................................................................23

*United States ex rel. Quartararo* v. *Cath. Health Sys. of Long Island Inc.,*
   84 F.4th 126 (2d Cir. 2023)................................................................9

*SEC* v. *Rio Tinto PLC,*
   2021 WL 1893165 (S.D.N.Y. May 11, 2021) ...........................11, 20

*SEC* v. *Rio Tinto PLC,*
   41 F.4th 47 (2d Cir. 2022)..................................................................9

*SEC* v. *Ripple Labs., Inc.,*
   682 F. Supp. 3d 308 (S.D.N.Y. 2023) (*Ripple I*) ..................*passim*

*SEC* v. *Ripple Labs., Inc.,*
   697 F. Supp. 3d 126 (S.D.N.Y. 2023) (*Ripple II*)...........................10

*SEC* v. *Ripple Labs., Inc.,*
   Nos. 24-2648, 24-2705 (2d Cir.)..................................................10, 21

*SEC* v. *Terraform,*
   684 F. Supp. 3d 170 (S.D.N.Y. 2023)...................................14, 15, 16

*SEC* v. *W.J. Howey Co.,*
   328 U.S. 293 (1946)...................................................................*passim*

*SFFA* v. *Harvard,*
   600 U.S. 181 (2023)..........................................................................23

*Utility Air Regulatory Grp.* v. *EPA,*
   573 U.S. 302 (2014)..........................................................................19

*Weber* v. *United States,*
   484 F.3d 154 (2d Cir. 2007) ..............................................................17

*Yu* v. *Hasaki Rest., Inc.*,
 874 F.3d 94 (2d Cir. 2017) ................................................................13

**Statutes and Rule**

15 U.S.C. § 77b(a)(1) .........................................................................5, 9, 17

15 U.S.C. §§ 77t(b), 77t(d), and 77(v) ..............................................5

15 U.S.C. § 78c(a)(10) .......................................................................5, 9, 17

15 U.S.C. §§ 78u(d), 78(e), and 78aa .............................................5

28 U.S.C. § 1292 ...............................................................................3

28 U.S.C. § 1292(b) ...................................................................*passim*

28 U.S.C. § 1331 ...............................................................................5

Fed. R. App. P. 5(a)(3) ......................................................................5

## INTRODUCTION

There is no more pressing issue in securities law today than the scope of the Securities and Exchange Commission's authority to regulate secondary trades of digital assets. These assets are now a permanent fixture of our financial system, with the global cryptocurrency market above three trillion dollars and growing. Coinbase operates the largest digital-asset trading platform in the United States, enabling millions of users to trade digital assets worth billions of dollars every month. Those users, along with crypto companies, the Commission, and lower courts, badly need clarity on what the federal securities laws require. Only this Court's immediate review can provide it.

Hearing this appeal will allow the Court to clear away the cloud that currently hangs over the cryptocurrency market. Simply put, the trades on Coinbase's platform do not trigger the federal securities laws. Sellers are matched in Coinbase's blind bid-ask system with buyers who want to exchange another digital asset or other currency. The parties are anonymous to each other, make no exchange or promise other than the sale of the digital asset itself, and thus have no obligation or continuing commitment to each other past the point of sale. Buyers also do not obtain any rights as against

1

the asset's issuer, as they do with securities like stocks or bonds. Trades on Coinbase's platform are thus not securities transactions but asset sales—albeit of digital assets rather than physical ones.

Not that long ago, the Commission's leadership agreed. *See Coinbase* v. *SEC*, __ F. 4th __, 2025 WL 78330, at *3 (3rd Cir. Jan. 13, 2025). In April 2021, the Commission accepted Coinbase's registration statement and allowed Coinbase to become a publicly traded company. Compl. ¶ 111. In May 2021, Chair Gary Gensler testified before Congress that "the exchanges trading in these crypto assets do not have a regulatory framework" at the SEC, and "only Congress" "could really" regulate "crypto exchanges." *Coinbase*, 2025 WL 78330, at *3. But after Congress considered and declined to pass various bills that would have regulated digital-asset trading, *see* Compl. ¶¶ 51-53, the Commission changed its tune, *see Coinbase*, 2025 WL 78330 at *3-4. In June 2023, it brought this action, claiming that the trades on Coinbase's platforms were securities transactions all along—and thus Coinbase had been operating an unregistered securities exchange in violation of the federal securities laws. Compl. ¶ 79.

Whether the Commission's leadership was right in 2021 or in 2023 turns on the meaning of the term "investment contract" in the federal

securities laws—and in particular on the Supreme Court's interpretation of that term in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946). In *Howey*, the Court held that an investment contract exists where "a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 299. The trading on Coinbase's platform does not meet that test: there is no common enterprise between the seller and buyer, who is not led to expect profits solely from any efforts by the seller or any other party. The district court here held that the *Howey* test is satisfied because purchasers expect digital-asset *issuers* to develop "the *ecosystem* surrounding a crypto-asset." App. 136a (emphasis added). That ruling is a sharp break from settled securities law. For nearly a century, no court had found an investment contract without a contractual undertaking that resulted in a post-sale obligation.

The district court correctly recognized that its decision warrants this Court's immediate attention. App. 111a, 137a-138a. It satisfies all three criteria for an interlocutory appeal under 28 U.S.C. § 1292—often in independently sufficient ways. First, it involves a "controlling question of law," both for these parties and for other litigation relating to the broader industry. App. 122a. Second, there is "a substantial ground for difference of

opinion." App. 131a.  District courts inside and outside this Circuit have taken different approaches, and the question is a novel and difficult one that this Court has not yet addressed.  App. 122a, 130a-131a.  Third, resolving this question not only would materially advance this litigation, but also would provide clarity to market participants and regulators alike.  App. 122a.  By any measure, the question of whether the Commission has jurisdiction over an innovative, multi-trillion-dollar industry merits this Court's attention.

The Court should therefore accept review of this case, which presents the single best opportunity to decide the fundamental legal question of how to treat the secondary trading of digital assets.  This Court has long played a preeminent role in shaping the law that governs financial markets, and its guidance is needed once again.  Without it, market participants face different rules before different courts, and neither the Commission nor Congress can be certain who is responsible for the regulation of digital-asset trading.  For all of the reasons given by the district court in its thorough order, this Court should accept certification.

## STATEMENT OF JURISDICTION

On January 7, 2025, the district court certified for appeal under 28 U.S.C. § 1292(b) its March 27, 2024 order denying in part Coinbase's

motion for judgment on the pleadings. This petition is timely because it was filed within ten days of that certification order. *See* 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(3). The district court had jurisdiction of this enforcement action under 28 U.S.C. § 1331; 15 U.S.C. §§ 77t(b), 77t(d), and 77(v); and 15 U.S.C. §§ 78u(d), 78(e), and 78aa.

## STATEMENT OF THE ISSUE

The question presented is whether or when digital-asset transactions in the secondary market are "investment contract[s]" within the meaning of the federal securities laws. 15 U.S.C. § 78c(a)(10); *see* 15 U.S.C. § 77b(a)(1).

## STATEMENT OF THE CASE

Since the release of the first cryptocurrency in 2009, the rise of the crypto industry represents one of the most significant technological developments of the twenty-first century. Coinbase has been at the vanguard of that development: founded in 2012, Coinbase is now the largest platform for trading digital assets in the United States. Millions of consumers trade hundreds of assets on its platform, including popular cryptocurrencies like Bitcoin, Ether, Solana, and XRP. But the Commission has never alleged that any of those transactions on Coinbase's platform involve a contract that includes post-sale obligations.

5

For a time, Coinbase's secondary-market trading—including in assets now featured in this case's complaint—had the apparent blessing of the Securities and Exchange Commission. In April 2021, after a six-month review, the Commission declared Coinbase's registration statement effective and in the public interest, and since that time Coinbase has been a publicly traded company. Compl. ¶ 111. Only two years later, however, the Commission did an about-face and brought this action, claiming among other things that Coinbase's platform is an unregistered securities exchange. *Id*. ¶ 79.

Coinbase moved for judgment on the pleadings. It argued that secondary-market trades of the various crypto assets at issue are not "investment contract[s]" for purposes of the federal securities laws under *Howey*. It also argued that applying those laws to digital-asset transactions is a major question and that Congress has not clearly authorized the Commission's unprecedented assertion of sweeping regulatory authority. The district court disagreed with both arguments and denied in relevant part judgment on the pleadings.

Coinbase then moved for certification under 28 U.S.C. § 1292(b), which the district court granted in a thorough and well-reasoned decision. The

court first held that "whether Coinbase's crypto-asset transactions are securities" "presents a clear and controlling question of law." App. 122a, 125a. That question is "a purely legal one because it is largely a matter of statutory interpretation, rather than a matter of analyzing the factual record." App. 127a. The court explained that the question would both "significantly affect the conduct of th[is] action" and have "precedential value for a large number of cases." App. 127a-128a (citation omitted). There is substantial ground for difference of opinion both "because (i) conflicting authority exists regarding *Howey*'s application to crypto-assets, and (ii) the application of *Howey* to crypto-assets raises a difficult issue of first impression for the Second Circuit." App. 131a. Finally, the court determined that an appeal "would materially advance the ultimate termination of the litigation because it could result in the dismissal of the bulk of the SEC's claims against Coinbase." App. 139a.

## ARGUMENT

This Court should review this case. As the district court correctly held, its order denying judgment on the pleadings satisfies all three Section 1292(b) criteria: it presents a controlling question of law, there is substantial ground for a difference of opinion, and an immediate appeal may materially

7

advance the litigation. Indeed, this case cries out for the Court's immediate attention. Whether secondary-market trading of digital assets falls within the federal securities laws is a question of immense importance to the crypto industry, consumers, financial institutions, and lower courts in need of guidance. This case presents an ideal vehicle to address that question and provide clear rules for this multi-trillion-dollar industry.

### A. Whether Digital-Asset Transactions In The Secondary Market Are Investment Contracts Is A Controlling Question Of Law.

The question whether trading a digital asset on a secondary market constitutes an investment contract is precisely the type of "pure question of law" that a reviewing court can "decide quickly and cleanly." *In re A2P SMS Antitrust Litig.*, 2015 WL 876456, at *3-4 (S.D.N.Y. March 2, 2015) (citations and quotations omitted). And it is "controlling" for two reasons: its favorable resolution for Coinbase could "result in dismissal of the action" or "could significantly affect the conduct of the action," and the Court's decision would have significant precedential value for other cases. *Id.*

### 1. The question presented is purely legal.

A pure question of law is one that this Court can answer by consulting only legal authorities and the pleadings. *See Dupree* v. *Younger*, 598 U.S.

729, 735 (2023) ("[P]urely legal issues" are those "that can be resolved without reference to any disputed facts."). The quintessential example is a question of statutory interpretation. *See Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369, 387 (2024) ("[T]he interpretation of the meaning of statutes" is a "question[] of law."). For that reason, this Court routinely accepts certification under Section 1292(b) for questions of statutory interpretation. *See, e.g.*, *Kasiotis* v. *New York Black Car Operators' Inj. Comp. Fund, Inc.*, 90 F.4th 95 (2d Cir. 2024); *United States ex rel. Quartararo* v. *Cath. Health Sys. of Long Island Inc.*, 84 F.4th 126 (2d Cir. 2023); *SEC* v. *Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022).

The district court correctly held that an appeal here presents a "pure question of law" because it involves the interpretation of a federal statutory provision that does not rest on any factual dispute between the parties. App. 125a-126a. The sole dispute at this stage is the meaning of "investment contract" under the federal securities laws. 15 U.S.C. § 78c(a)(10); *see* 15 U.S.C. § 77b(a)(1). The assets at issue were traded on the secondary market on a blind bid-ask basis, meaning that the parties did not know each other's identity. Compl. ¶¶ 88, 97. The Commission has never alleged that, as with traditional securities, any rights or obligations ran with the assets

9

from the issuers to the purchasers. Nor has the Commission alleged that Coinbase intended to disregard the federal securities laws. For those reasons, the district court decided whether these transactions were investment contracts "based on the pleadings and without a factual record." App. 126a. This Court too would need to consult only "a limited universe of familiar texts"—in particular, the statute, the Supreme Court's decision in *Howey*, and its recent decisions on the major-questions doctrine. *Id.* (internal quotation marks omitted).

The district court contrasted this case with *SEC* v. *Ripple Labs., Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023) (*Ripple I*), which is currently on appeal before this Court. *See* App. 126a; *SEC* v. *Ripple Labs., Inc.*, Nos. 24-2648, 24-2705 (2d Cir.). In *Ripple*, another district court concluded that whether the particular crypto transactions there were investment contracts required careful review of "an extensive, heavily disputed factual record and detailed expert reports." *SEC* v. *Ripple Labs., Inc.*, 697 F. Supp. 3d 126, 132 (S.D.N.Y. 2023) (*Ripple II*) (denying motion to certify for interlocutory appeal the order in *Ripple I*). By contrast, the district court here correctly treated "the application of *Howey* to crypto-asset transactions" as a legal question, not a factual one. App. 126a. The court answered that question the wrong way,

but the relevant point is that this case presents a clean, purely legal vehicle for addressing whether secondary-market transactions are investment contracts under the *Howey* framework. Because *Ripple* is already before this Court, that weighs heavily in favor of interlocutory review in this case, where there are no potential barriers to resolving the broader legal question.

### 2.    The question presented is controlling.

A question is "controlling" if this Court's guidance would considerably narrow the scope of the litigation. *See Hart* v. *Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 393 (S.D.N.Y. 2014) (citation and quotations omitted); *see also In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (Friendly, J.) ("[A] controlling question of law ... include[s] a procedural determination that may importantly affect the conduct of an action."). A question can also be "controlling" in the broader sense if its resolution would produce "precedential value for a large number of cases." *SEC* v. *Rio Tinto PLC*, 2021 WL 1893165, at *2 (S.D.N.Y. May 11, 2021); *see Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990).

As the district court explained, the question here is controlling in both senses. For starters, this Court's resolution of the question in Coinbase's favor would "dispose of the SEC's principal claims, which account for the

bulk of the complaint's factual allegations." App. 127a. If digital-asset transactions in the secondary market are not investment contracts under *Howey*, then Coinbase is not an unregistered securities exchange, full stop. And of course if regulating digital-asset transactions is a major question and Congress has not clearly delegated that authority to the Commission, then this entire litigation is over because the ball is in Congress's court. Resolving the question thus "could significantly affect the conduct of th[is] action." *Dev. Specialists, Inc.* v. *Akin Gump Strauss Hauer & Feld LLP*, 2012 WL 2952929, at *4 (S.D.N.Y. July 18, 2012) (citation omitted).

The question is "controlling in the broader sense too," because this Court's decision would have significant "precedential value" for other cases. App. 129a. Already to date, multiple lower courts have reached conflicting conclusions after struggling to apply *Howey* to the secondary market for digital-asset transactions. As the district court put it, the fact of "these conflicting decisions on an important legal issue necessitate[s] the Second Circuit's guidance." App. 130a. Crypto companies, consumers, the Commission, traditional financial institutions, and lower courts would all benefit from an authoritative ruling from this Court. The Commission itself said as much when it urged the district court in *Ripple* to certify an

interlocutory appeal. *See* SEC Mem. of Law in Supp. of Mot., *Ripple*, ECF No. 893 (S.D.N.Y. Aug. 18, 2023), at 2 ("[T]he intra-district split on critical aspects of the legal framework governing the [Commission's] claims heightens the need for appellate resolution."). The Commission was right then and the district court is right now: this Court's review is needed.

### B. Whether Digital-Asset Transactions In The Secondary Market Are Investment Contracts Provides Substantial Ground For Difference Of Opinion.

Substantial ground for difference of opinion exists when "there is conflicting authority on the issue, or the issue is particularly difficult and of first impression for the Second Circuit." *In re Enron Corp.*, 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007) (internal quotation marks omitted). As the district court recognized, this petition "meets not one but both independently sufficient tests under the second prong of Section 1292(b)." App. 139a.

### 1. The question has divided several district courts.

Most obviously, there is substantial ground for difference of opinion because there are already "differing rulings . . . within this Circuit." *Yu* v. *Hasaki Rest., Inc.*, 874 F.3d 94, 98 (2d Cir. 2017). So far, five district judges— three within this Circuit, one in the District of Columbia, and one in the

Northern District of California—have disagreed over how the *Howey* framework applies to secondary-market transactions in crypto assets.

In *Ripple I*, the district court (Torres, J.) concluded that blind bid-ask crypto transactions involving the issuer are not investment contracts. *See* 682 F. Supp. 3d at 330. The court reasoned that, among other things, the issuer "did not make any promises or offers because [it] did not know who was buying" the crypto asset; "the purchasers did not know who was selling" the crypto asset; and the secondary-market sales "were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose." *Id.* at 329. That reasoning applies equally here, but the court in *Ripple I* made clear that it was not deciding the question of whether secondary-market transactions are investment contracts when the parties have no relationship to the issuer. *See id.* at 329 n.16. Only this case presents the Court with the opportunity to decide that broader and far more consequential issue.

A split emerged days after *Ripple I* when another district court (Rakoff, J.) decided *SEC* v. *Terraform*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023). There, the court expressly disagreed with *Ripple I* by concluding that at least in some circumstances bid-ask crypto transactions may constitute

14

investment contracts when the asset's issuer is one of the traders. *Id.* at 197 (citing *Ripple I*, 682 F. Supp. 3d at 328).

The district court below (Failla, J.) deepened the split by adopting reasoning akin to *Terraform*'s and extending its application to secondary-market transactions not involving issuers. *See* App. 131a, 133a. In direct conflict with *Ripple I*, the court held that a secondary-market transaction can constitute an investment contract even if the issuer has never interacted with the buyer, merely because the purchaser expects some return from "the continued development of the ecosystem surrounding a crypto-asset." App. 136a. On that reasoning, of course, *any* secondary-market transaction can be an investment contract, depending on the purchaser's expectation.

Since the decision below, the conflict has spread beyond this Circuit. In *SEC* v. *Binance Holdings Limited*, the district court for the District of Columbia (Jackson, J.) indicated that it agreed with the reasoning of *Ripple I*, and thus questioned whether crypto transactions conducted on secondary markets can qualify as investment contracts. *See* 2024 WL 3225974, at *19-20 (D.D.C. Jun. 28, 2024). By contrast, in *SEC* v. *Payward, Inc.*, the district court for the Northern District of California (Orrick, J.) found that the Commission had pleaded its way around *Ripple I* and

15

*Binance*, although that case too was about secondary-market transactions not involving issuers. *See* 2024 WL 4511499, at *15-16 (N.D. Cal. Aug. 23, 2024).

In its certification order here, the district court correctly rejected the notion that the different outcomes in *Ripple I*, *Terraform*, *Binance*, and this case could be explained by factual differences between the different crypto assets. As the court explained, there is "persistent disagreement about how to apply *Howey* to crypto-assets." App. 132a. Simply put, market participants now face conflicting rules both inside and outside this Circuit. That is an untenable position for companies like Coinbase that operate nationwide exchanges—and for the tens of millions of Americans who own digital assets with the expectation that they can transact with one another on the secondary markets without the overlay of the federal securities laws. More than ground for difference of opinion, there is an *actual* difference that only this Court can resolve.

### 2.    The question is particularly difficult and of first impression.

The second prong of Section 1292(b) is satisfied for the independent reason that "the issue is particularly difficult and of first impression for [this Court]." *Capitol Records, LLC* v. *Vimeo, LLC*, 972 F. Supp. 2d 537, 551

(S.D.N.Y. 2013); *see Weber* v. *United States*, 484 F.3d 154, 159 (2d Cir. 2007) (Congress passed Section 1292(b) "to assure the prompt resolution of knotty legal problems."). The primary consideration is "the strength of the arguments in opposition to the challenged ruling." *Capitol Records*, 972 F. Supp. 2d at 551. Even the district court, although it disagreed with Coinbase's arguments, recognized that the question of how *Howey* applies to digital assets "raises a difficult issue of first impression for the Second Circuit." App. 131a; *see* App. 138a ("There is indeed substantial ground to dispute how *Howey* is applied to crypto-assets and the role of the surrounding digital ecosystem in that analysis.").

To start, the text of the federal securities laws requires an "investment contract." 15 U.S.C. § 78c(a)(10); *see* 15 U.S.C. § 77b(a)(1). As the Supreme Court explained in *Howey*, that term covers a sale where the buyer has gotten a commitment from the seller to act in ways that will cause the asset to increase in value or generate a profit. *See* 328 U.S. at 298-299. After all, it is the commitment to deliver future value—rather than the mere expectation or hope that the asset will rise in value—that distinguishes an investment contract from an ordinary asset sale. Every day people buy countless things, from land to baseball cards to comic books, that they expect to appreciate in

17

value based on the specific actions or efforts of others, or even simply based on the general ecosystem in which those assets are traded. But the mere expectation of appreciation does not convert such sales into securities transactions.

*Howey* itself is an excellent example of the difference between a simple asset sale and an investment contract. There, the owners of a Florida resort marketed adjacent orange groves to out-of-towners, walking them around the groves and giving them a sales talk that touted how buying a grove plot would generate sizable returns from the company's fruit harvesting. *See* 328 U.S. at 296-297. The purchasers were not simply buying into an amorphous "ecosystem" with the mere hope of receiving profit from others' promotional efforts. Rather, they were affirmatively induced into a "common enterprise" or "profit-seeking business venture" by Howey's contractual undertaking to "cultivat[e], harvest[] and market[]" the orange groves. *Id.* at 299-300. That undertaking was a post-sale obligation: Howey could not simply sell the land and then pack up shop. Here, neither the secondary-market traders nor the issuers make any similar commitments.

At a minimum, the term "investment contract" in the Securities Exchange Act does not clearly extend to the trading of digital assets on a

18

secondary market by unrelated parties who make no post-sale commitments to one another. That alone should resolve this appeal under the major-questions doctrine. Because the question of how to treat secondary-market crypto transactions is one of "vast economic and political significance," *Utility Air Regulatory Grp.* v. *EPA*, 573 U.S. 302, 324 (2014) (citation and quotation omitted), the Commission must point to "clear congressional authorization" for its regulatory oversight, *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2375 (2023). It lacks such authority here. *Cf. Coinbase*, 2025 WL 78330 at *28 (Bibas, J., concurring) ("One might wonder if an agency whose mission is maintaining fair, orderly, and efficient markets is authorized to ban an emerging technology."). That is a second reason why the question presented is sufficiently difficult to warrant this Court's attention.

## C. An Immediate Appeal May Materially Advance the Litigation.

Finally, as the district court recognized, "immediate interlocutory appeal would materially advance the ultimate termination of the litigation because it could result in dismissal of the bulk of the SEC's claims against Coinbase." App. 139a. The analysis on this prong "in practice is closely connected to the first factor." *Capitol Records*, 972 F. Supp. 2d at 551 (internal quotation and citation omitted). It centers on the "institutional

19

efficiency of both the district court and the appellate court." *Rio Tinto*, 2021 WL 1893165, at *2. Here, "an intermediate appeal promises to advance the time for trial or to shorten the time required for trial." *Capitol Records*, 972 F. Supp. 2d at 551. And it would create significant efficiencies for this Court when considered in conjunction with the pending *Ripple* appeals.

1.     If this Court were to agree with Coinbase that the trades on its platform are not securities transactions, that would "substantially reduce the issues to be tried." App. 140a. As the district court explained, "three quarters of the SEC's allegations in this case" would drop out altogether because they pertain exclusively to claims under the Exchange Act. App. 140a. And depending on this Court's reasoning, the full case could be resolved: the remaining claims involve Coinbase's "staking" program, which the district court analyzed under the *Howey* framework too. App. 141a (noting that this Court could address the staking program on appeal).

The interests of judicial economy thus favor this Court's immediate review. Without this Court's intervention on this pure question of law, the litigation could be "consume[d]" by years of cumbersome and costly analysis of the "facts relating to the 'ecosystems' of the 12 [crypto assets] the SEC has identified." App. 140a. The district court rejected the SEC's

20

characterization of those burdens as "overstated," noting that it had recently extended the discovery deadlines for the second time. App. 141a. And it explained that because this important issue will land on this Court's doorstep one way or the other, "it would hardly be efficient for this action to proceed under the sword of Damocles." App. 141a. Instead, this Court should act now to resolve the standalone statutory-interpretation question and remove the "cloud of legal uncertainty that hangs over" other actions and the conduct of this multi-trillion-dollar industry and its various stakeholders. *FHFA* v. *UBS Ams., Inc.*, 858 F. Supp. 2d 306, 337-338 (S.D.N.Y. 2012) (citation omitted); *see, e.g.*, *Payward, Inc.*, 2024 WL 4511499.

2.    Interlocutory review here would be particularly beneficial because it will coincide with this Court's review of *SEC* v. *Ripple Labs., Inc.*, Nos. 25-2648, 24-2705. Briefing in those appeals is currently scheduled to extend into July if the parties take their full allotted time, and so this case could easily catch up if this Court wishes to review the cases together. In any event, it is important for the Court to review this case in addition to *Ripple* for three reasons.

First, *Ripple* presents less than half the story, raising the narrow and peripheral question of how to treat transactions by a single issuer of a single

digital asset (XRP). The district court in *Ripple I* expressly declined to address the far broader question of secondary-market transactions involving parties unrelated to the issuer. *See* 682 F. Supp. 3d at 329 n.16. This case concerns only such trades and for a wide variety of assets. The type of transactions at issue in this case make up the lion's share of crypto trading today, and legal uncertainty over such trades casts a shadow over many billions of dollars of transactions in today's markets. Granting review here is thus critical to ensuring that the overarching question of how to apply *Howey* to secondary-market transactions of digital assets is thoroughly ventilated. Coinbase represents the ideal party for testing the Commission's authority because the company hosts one of the most popular platforms that ordinary consumers use to access crypto assets, and its operations represent the heartland of an industry the Commission is attempting to regulate for the first time.

Second, this appeal presents a pure question of statutory interpretation. By contrast, as the district court explained, *Ripple* involved a series of factual determinations that could complicate this Court's ability to decide the overarching legal question. App. 126a-127a. This Court should get a clean shot at that question, and interlocutory review here ensures that

it will. It also ensures that this Court will have the benefit of two lower-court opinions before it that take different approaches. The Supreme Court has routinely consolidated some of its highest profile cases in recent years, *see, e.g.*, *Moody* v. *NetChoice, LLC*, 603 U.S. 707 (2024); *Loper Bright Enter.* v. *Raimondo*, 603 U.S. 369 (2024); *Axon Enter.* v. *FTC*, 598 U.S. 175 (2023); *SFFA* v. *Harvard*, 600 U.S. 181 (2023), and the same considerations should guide this Court's exercise of its discretionary review.

Third, this Court should have briefing on the major-questions doctrine when deciding this question. Although the Court could resolve these cases in favor of the regulated parties without resorting to that doctrine, its application independently resolves these cases by confirming that the Commission cannot regulate secondary-market digital-asset transactions without specific congressional authorization. Granting this petition therefore ensures that this Court will be fully able to grapple with this important argument because Coinbase, unlike Ripple, has pressed this argument at every stage of the litigation.

Timing also poses no obstacle because this case can proceed alongside *Ripple* for both briefing and argument. The Commission's opening brief in its *Ripple* appeal was filed just two days ago, and the entire four-brief

23

schedule will conclude in July if the parties take their full allotted time. If this Court promptly grants review here and elects to consolidate the appeals for oral argument, then this case could catch up to the *Ripple* briefing schedule with at most a mildly expedited briefing schedule. In the alternative, this Court could consolidate the appeals for briefing as well, and set a new briefing schedule for both so that the incoming administration has time to provide its considered thoughts on these enforcement actions and its reading of the statutory scheme.

*     *     *

This appeal presents an unsettled, hugely significant question that will shape the future of the cryptocurrency industry. Consumers, companies, regulators, and lower courts alike would benefit from this Court's guidance. As the district court explained in a comprehensive order, this case is an ideal candidate for certification under any view of the Section 1292(b) factors. This Court should accept certification.

## CONCLUSION

The Court should grant Coinbase permission to appeal from the district court's order denying the motion for judgment on the pleadings.

Respectfully submitted,

/s/ *Jeffrey B. Wall*

| | |
|---|---|
| William Savitt | Jeffrey B. Wall |
| Kevin S. Schwartz | Morgan L. Ratner |
| Sarah K. Eddy | SULLIVAN & CROMWELL LLP |
| WACHTELL, LIPTON, ROSEN & KATZ | 1700 New York Avenue, N.W. |
| 51 West 52nd Street | Suite 700 |
| New York, New York 10019 | Washington, D.C. 20006 |
| (212) 403-1000 | (202) 956-7500 |

Steven R. Peikin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendants-Petitioners*
*Coinbase Inc., and Coinbase Global, Inc.*

January 17, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because this brief contains 5,102 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.  That approximation is based on the word-count function of the word-processing program used to draft the brief.

I further certify that this brief complies with the requirements of Rule 32(a) because this brief has been prepared in 14-point font in a proportionally spaced typeface using Microsoft Word 2016.

Dated:  January 17, 2025

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CAPTION:

Coinbase

**CERTIFICATE OF SERVICE***

v.

Docket Number: _____

SEC

I, Jeffrey B. Wall _____, hereby certify under penalty of perjury that
(print name)

on 1/21/2025 _____, I served a copy of _the petition for permission to appeal pursuant to 28 U.S.C. § 1292(b)_
(date)

and the petition appendix _____
(list all documents)

by (select all applicable)**

___ Personal Delivery         ___ United States Mail         ___ Federal Express or other
                                                                 Overnight Courier

___ Commercial Carrier     Y E-Mail (on consent)

on the following parties:

Ben Kuruvilla      kuruvillabe@sec.gov

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or proceeding. The Court will reject papers for filing if a certificate of service is not simultaneously filed.

**If different methods of service have been used on different parties, please complete a separate certificate of service for each party.

01/21/2025 _____        /S/ Jeffrey B. Wall _____
Today's Date                              Signature

Certificate of Service Form (Last Revised 12/2015)