# 25-145

# United States Court of Appeals
# for the Second Circuit

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Respondent,*

v.

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants-Petitioners.*

On Appeal from the United States District Court
for the Southern District of New York,
Case No. 1:23-cv-04738, Hon. Katherine Polk Failla

## BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION IN SUPPORT OF PETITION FOR PERMISSION TO APPEAL

DONALD B. VERRILLI, JR.
ELAINE J. GOLDENBERG
SARAH E. WEINER
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Amicus Curiae*

January 21, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus* The Blockchain Association hereby discloses that it has no parent corporation, and no publicly held corporation owns 10% or more of any stock in *amicus*.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ................... 1

ARGUMENT ..................................................................................... 2

I.    Whether A Digital Asset And Its "Ecosystem" Can Constitute An "Investment Contract" Is A Novel Legal Question Meriting Immediate Appellate Review ........................... 3

II.   The Unprecedented "Ecosystem" Theory Is of Special Consequence Because It Risks Dangerously Overbroad Application ...................................................................... 9

CONCLUSION .............................................................................. 15

CERTIFICATE OF COMPLIANCE ..................................................... 16

CERTIFICATE OF SERVICE ........................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Balintulo v. Daimler AG*,
   727 F.3d 174 (2d Cir. 2013) .............................................................. 2, 9

*Klinghoffer v. S.N.C. Achille Lauro*,
   921 F.2d 21 (2d Cir. 1990) ................................................................. 2

*Mohawk Indus. v. Carpenter*,
   558 U.S. 100 (2009) ........................................................................... 2

*United States ex rel. Quartararo v. Cath. Health Sys. of Long Island*,
   84 F.4th 126 (2d Cir. 2023) ................................................................ 3

**REGULATORY CASES**

*In the Matter of Tether Holdings Ltd.*,
   No. 22-04 (CFTC Oct. 15, 2021), available at
   https://www.cftc.gov/media/6646/enftetherholdings
   order101521/download ........................................................................ 9

**FEDERAL STATUTES**

28 U.S.C. § 1292(b) ................................................................................ 2, 15

**RULES**

Fed. R. App. P. 29(a)(4)(E) .................................................................... 1

**OTHER AUTHORITIES**

https://filecoin.io/store/#intro (last visited Jan. 19, 2025) ................. 7, 14

Paul Grewal, *Petition for Rulemaking* (July 21, 2022),
   https://www.sec.gov/files/rules/petitions/2022/
   petn4-789.pdf ...................................................................................... 13

iii

Paul Grewal, *We Asked The SEC For Reasonable Crypto Rules For Americans. We Got Legal Threats Instead.*, Coinbase (Mar. 22, 2023), https://www.coinbase.com/blog/we-asked-the-sec-for-reasonable-crypto-rules-for-americans-we-got-legal ...................................................... 14

William Hinman, SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ............. 9, 10

*Kennedy and Crypto*, SEC (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ................................................................ 12

Chavie Lieber, *Why Fashion Brands Destroy Billions' Worth of Their Own Merchandise Every Year*, Vox (Sept. 17, 2018), https://www.vox.com/the-goods/2018/9/17/17852294/fashion-brands-burning-merchandise-burberry-nike-h-and-m ...................................... 4

Kellie Mejdrich, *Crypto 'Wild West' Requires New Laws, SEC Chair Says*, Politico (Aug. 3, 2021), https://www.politico.com/news/2021/08/03/bitcoin-cryptocurrency-regulation-sec-502281 ................................ 13

Shalini Nagarajan, *Dogecoin's Creator Sold All His Coins 6 Years Ago*, Business Insider (Feb. 12, 2021), https://markets.businessinsider.com/currencies/news/dogecoin-creator-sold-coins-years-ago-laid-off-crypto currency-mania-2021-2-1030077260 ................................... 11

*On Today's Episode of As the Crypto World Turns*, SEC (March 5, 2024), https://www.sec.gov/news/statement/peirce-uyeda-statement-a-crypto-world-turns-03-06-24 ..................................................... 13

Hester M. Peirce, *Kraken Down: Statement on* SEC v. Payward Ventures, Inc., *et al.*, SEC (Feb. 9, 2023), https://www.sec.gov/news/statement/peirce-statement-kraken-020923 ................................................................ 13

Pete Rizzo, *10 Years Ago Today, Bitcoin Creator Satoshi Nakamoto Sent His Final Message*, Forbes (Apr. 26, 2021), https://www.forbes.com/sites/peterizzo/2021/04/26/10-years-ago-today-bitcoin-creator-satoshi-nakamoto-sent-his-final-message/?sh=4edb084b10dd .................................................................. 11

Leo Schwartz, *Former SEC Crypto Leader Spars With Blockchain Lawyers*, Fortune (Apr. 17, 2024), https://fortune.com/crypto/2024/04/17/sec-crypto-litigation-ladan-stewart-columbia-regulation/ .................................... 12

Leo Schwartz, *So Why Isn't a Pokemon Card a Security?*, Yahoo Finance (Dec. 6, 2023), https://finance.yahoo.com/news/why-isn-t-pokemon-card-143742057.html ................................... 7

*What Is Ethereum?*, https://ethereum.org/en/what-is-ethereum/ (last visited Jan. 19, 2025) ................................................. 10

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[1]

The Blockchain Association ("BA") is a nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital-asset economy. BA endeavors to achieve regulatory clarity and to educate courts and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer- friendly digital marketplace. BA represents over 100 member companies reflecting the wide range of participants in the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.

BA has a significant interest in this case. The legal rule adopted in the decision that the district court certified for this Court's review would have enormously negative repercussions for the digital-asset economy. That is especially true with respect to open-source software developers using blockchain technology, including the creators of the digital assets

---

[1] Under Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* confirms that no party or counsel for any party authored this brief in whole or in part, and no person other than *amicus* or its counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

sold on Coinbase, as to which the Securities and Exchange Commission (the "Commission" or "SEC") has provided no viable path for registration that is purportedly required. The vast majority of participants in the digital-asset industry have no voice in Commission enforcement actions, like this one, against a secondary cryptocurrency marketplace. *Amicus* therefore respectfully seeks to provide an industry perspective on why this case calls out for interlocutory review.

## ARGUMENT

The Section 1292(b) criteria are easily satisfied in this case, as Coinbase's petition discusses. *See* 28 U.S.C. § 1292(b). *Amicus* focuses here on explaining why the district court's ruling "involves a new legal question" and "is of special consequence"—two considerations that counsel *especially strongly* in favor of interlocutory review under Section 1292(b). *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 111 (2009); *see Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013); *see Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (difficult and novel question also supports a finding that there is "substantial ground[] for difference of opinion" under Section 1292(b)).

## I. Whether A Digital Asset And Its "Ecosystem" Can Constitute An "Investment Contract" Is A Novel Legal Question Meriting Immediate Appellate Review

The determination in the certified decision that digital-asset transactions on Coinbase could involve "investment contracts" within the meaning of the relevant statute hinges on the Commission's novel "ecosystem" theory. That theory posits that someone who purchases a digital token in a secondary market is "buying into [an] ecosystem" created and maintained by the token's "issuers" and "project team." Dkt.101 ("Tr.") 19, 57. The "ecosystem" theory was essential to the district court's analysis of both disputed prongs of the *Howey* test for determining whether an investment contract exists: whether there is a "common enterprise," and whether "purchasers had a reasonable expectation to profit from the efforts of others." App.136a.

Whether the "ecosystem" theory faithfully implements the *Howey* test is, as the district court recognized, "a novel question of law in the Second Circuit." *United States ex rel. Quartararo v. Cath. Health Sys. of Long Island*, 84 F.4th 126, 129 (2d Cir. 2023); *see* App.138a. Indeed, that theory has never been passed upon, much less adopted by, this Court— or, for that matter, any other federal court of appeals. *See* App.137a.

3

This Court's review is urgently needed because the district court's ruling that an investment contract can be formed by an asset plus an "ecosystem," App.72a, risks recategorizing a huge swath of economic activity as activity involving "securities" that is subject to regulation by the Commission. Under such a standard, the purchase of any asset in a secondary market could be an "investment contract," and therefore a security, whenever (1) the asset's "market value" is "dependent" on the health of the asset's "ecosystem," and (2) the asset's "issuers and promoters" have made public statements indicating that they would endeavor to "improve the value of the asset" (perhaps with proceeds from sales of the asset), including by "reduc[ing] [its] total supply." App.33a n.4, App.75a-79a.

That standard could transform luxury consumer goods into "securities," because the price of such goods is driven by sophisticated marketing (including the production of "limited editions") and tight control over the secondary market. *See, e.g.*, Chavie Lieber, *Why Fashion Brands Destroy Billions' Worth of Their Own Merchandise Every Year*, Vox (Sept. 17, 2018), https://www.vox.com/the-goods/2018/9/17/17852294/fashion-brands-burning-merchandise-burberry-nike-h-and-m.

The standard could transform into "securities" all manner of collectibles—such as wines, art, postage stamps, comic books, and baseball cards—that have little to no inherent value outside of an "ecosystem" of producers, collectors, authenticators, and appraisers who believe in and promote those products' worth. And it could capture the sale and purchase of all sorts of commodities, like gemstones and precious metals, that derive their value from society's collective decision to treat them as valuable—driven in no small part by their scarcity and the promotional efforts of businesses in those markets.

The certified decision suggests that "the offer and sale of cryptocurrencies" is distinguishable from "commodities or collectibles" on the ground that the latter "may be independently consumed or used" but the former "is necessarily intermingled with its digital network." App.85a; *accord* App.137a-138a. But that distinction does not hold up in the Internet age, in which nearly all popular digital and physical goods may be marketed, exchanged, and even "consumed or used" online. App.85a. First, the value of physical goods—just like cryptocurrencies— cannot be divorced from those goods' "ecosystems." For example, although rare baseball cards, which have enormous value as collectibles,

5

could *theoretically* be used as a convenient source of statistics, "the economic reality," App.67a, is that investors purchase such assets for their speculative value rather than for their intrinsic utility. That value, in turn, is created and maintained by the "'full set of contracts, expectations, and understandings' surrounding [those assets'] sale and distribution"—*i.e.*, their "ecosystem[s]." App.72a. And many of those "ecosystems" are primarily digital—that is, they are enabled by software that allows fans, producers, promoters, verifiers, and secondary-market sellers and buyers to interact (and transact) online, including in ways that cause popular physical goods to go up in value. But deeming transactions in Beanie Babies on eBay or designer sneakers on StockX to be "investment contracts" under the *Howey* test would be an absurd and highly novel result, notwithstanding that the value of those assets is tied to their associated "ecosystems."

Second, just like commodities, luxury goods, and collectibles, digital assets often have utility beyond their simple potential to appreciate in value. The nature of that utility varies widely. For example, Filecoin (FIL) can be used by customers to pay for data storage and retrieval on Filecoin's innovative cloud-based, decentralized storage network. *See*

https://filecoin.io/store/#intro (last visited Jan. 19, 2025). Axie Infinity Shards (AXS), the native token of the blockchain game "Axie Infinity," can be earned by players for "successfully playing the Axie game" and then "use[d] . . . to make in-game purchases." Dkt.1 ¶¶ 203-205. And the Chiliz (CHZ) token can be used to purchase "voting rights" to "influence [sports'] team decisions," including "selecting player warm-up apparel and choosing team pennant designs." App.44a.

Accordingly, it is impossible to distinguish between transactions in digital assets and transactions in luxury goods, collectibles, or commodities under the "ecosystem" theory. There is no statutory basis, for example, to treat transactions in digital Pokémon cards on the blockchain as "investment contracts" but transactions in physical Pokémon cards as mere sales of collectibles. *See* Leo Schwartz, *So Why Isn't a Pokemon Card a Security?*, Yahoo Finance (Dec. 6, 2023), https://finance.yahoo.com/news/why-isn-t-pokemon-card-143742057.html (summarizing testimony by Chairman Gensler that "buying a Pokemon card would not be a security transaction, but it might if it were tokenized on the blockchain"). The former kind of asset is made out of zeroes and ones while the latter is made out of molecules—but that does not change

7

the fact that both kinds of assets would be essentially valueless without their "ecosystems" of developers, players, and collectors. A rule that distinguishes between them could do so only by applying a technology-specific test that finds no grounding in the securities laws.

Moreover, to the extent the certified decision suggests that an "investment contract" includes any transaction involving an asset that relies on a "digital network" for its "exist[ence]," or about which initial promises or sales were made by the asset's creators, that position would lead to an outcome that both the Commission and the Commodity Futures Trading Commission ("CFTC") have disavowed. App.74a, App.85a-86a. Such a rule risks transforming *all* transactions in cryptocurrencies into securities transactions without exception, including transactions involving Bitcoin and Ether—the value of which "is necessarily tied to" and "intermingled with" those tokens' "digital ecosystem[s]," and the "exist[ence]" of which relies on "digital network[s]." App.85a-86a. The Commission itself, however, has recognized that transactions in Bitcoin and Ether—regardless of the way those assets were initially sold and whatever the managerial efforts of their creators may have been—are *not* securities transactions given that

8

those tokens now operate on "decentralized" networks.  William Hinman, SEC, *Digital Asset Transactions: When* Howey *Met* Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.  And the CFTC has taken the position that transactions in "[d]igital assets such as bitcoin, ether, litecoin, and tether tokens are commodities," not securities.  *In the Matter of Tether Holdings Ltd.*, No. 22-04, at 8 (CFTC Oct. 15, 2021), *available at* https://www.cftc.gov/media/6646/ enftetherholdingsorder101521/download.  Those agency positions strongly underscore that whether a transaction in a digital asset should be treated as an "investment contract" due to the existence of an associated "ecosystem" is, at minimum, a "difficult issue of first impression" that warrants this Court's review.  App.138a.

## II.  The Unprecedented "Ecosystem" Theory Is of Special Consequence Because It Risks Dangerously Overbroad Application

The legal conclusions set forth in the certified order are also of "special consequence," *Balintulo*, 727 F.3d at 186 (citation omitted), to the *entire* digital-asset industry, including but not limited to digital-asset platforms like Coinbase.  The "ecosystem" theory risks transforming a large swath of software developers into issuers or promoters of securities

9

who would be required to abide by securities law requirements such as registration with the Commission, and thus poses an extremely serious threat to those developers and the innovative projects they create.

The first problem with defining transactions in digital assets as "investment contracts," and thus requiring registration with the Commission, is that it is far from clear who should make (and maintain, quarterly and annually) such registrations. The digital networks on which digital assets rely often involve a number of independent actors (or groups of actors), each playing a different role in the perpetuation of the "ecosystem" as a whole. For instance, a blockchain "ecosystem" may include unrelated developers who contribute code for a protocol early in the project and then are no longer involved, developers who join later to fix specific bugs and then never have any other involvement, or developers who are focused on designing future improvements. *See, e.g.*, *What Is Ethereum?*, https://ethereum.org/en/what-is-ethereum/ (last visited Jan. 19, 2025) ("the Ethereum source code is not produced by a single entity"); William Hinman, SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418. Those entities may do so as wholly

separate organizations without any formal or informal obligations to each other.

It is no answer to say that the original creator should be responsible for registration, because a digital asset is not dependent on the continued existence of the person or entity that created it. Digital assets can continue to have value even if their creators are no longer putting any effort into developing or maintaining their "ecosystems"—indeed, even if their creators are defunct. For example, the creator of Bitcoin abandoned the project more than a dozen years ago, *see* Pete Rizzo, *10 Years Ago Today, Bitcoin Creator Satoshi Nakamoto Sent His Final Message*, Forbes (Apr. 26, 2021), https://www.forbes.com/sites/peterizzo/2021/04/26/10-years-ago-today-bitcoin-creator-satoshi-nakamoto-sent-his-final-message/?sh=4edb084b10dd, and the DOGE token continues to trade at high volumes even though its creator has publicly walked away from the token, *see* Shalini Nagarajan, *Dogecoin's Creator Sold All His Coins 6 Years Ago*, Business Insider (Feb. 12, 2021), https://markets.business insider.com/currencies/news/dogecoin-creator-sold-coins-years-ago-laid-off-cryptocurrency-mania-2021-2-1030077260.

Even if the question of *who* should register could be answered, there would remain the question of *what* should be registered. Although the Commission agrees that digital assets themselves are not securities, *see* Tr.21, it has never explained what precisely constitutes an "ecosystem"— or, more practically, how one could go about registering an "ecosystem" as a security. *See* Tr.22 (Commission describing "investment contract" as a "token . . . plus the totality of the inducements" surrounding it); Leo Schwartz, *Former SEC Crypto Leader Spars With Blockchain Lawyers*, Fortune (Apr. 17, 2024), https://fortune.com/crypto/2024/04/17/sec-crypto-litigation-ladan-stewart-columbia-regulation/ (former Commission unit chief stating that "the token, plus 'all the stuff around the token,' is the security" but "[y]ou can't obviously register all the stuff"). Although the Commission's most recent Chairman stated that "the vast majority" of digital assets "are securities" and admonished "entrepreneurs to get their tokens registered and regulated," he also admitted that only "[a] handful" of purported "crypto security tokens" have been able to successfully "register[] under the existing regime." Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

That is not because digital-asset developers are scofflaws. Instead, as SEC Commissioner Hester Peirce has observed, it is because the Commission has failed to provide any "workable registration process." Hester M. Peirce, *Kraken Down: Statement on* SEC v. Payward Ventures, Inc., *et al.*, SEC (Feb. 9, 2023), https://www.sec.gov/news/statement/peirce-statement-kraken-020923. "[W]ell-meaning entrepreneurs" and "innovators," in turn, are left "expose[d]" to a "regulatory sword of Damocles." Hester M. Peirce & Mark T. Uyeda, *On Today's Episode of As the Crypto World Turns*, SEC (March 5, 2024), https://www.sec.gov/news/statement/peirce-uyeda-statement-a-crypto-world-turns-03-06-24.

The same problem also applies to digital-asset trading platforms. Although the Commission has publicly stated that exchanges simply need to "come in [and] register," Kellie Mejdrich, *Crypto 'Wild West' Requires New Laws, SEC Chair Says*, Politico (Aug. 3, 2021), https://www.politico.com/news/2021/08/03/bitcoin-cryptocurrency-regulation-sec-502281, in practice that has been an impossible task. The efforts of the defendants in this action provide a cautionary tale. Coinbase petitioned the Commission for a rulemaking concerning the "offer, sale, registration, and trading of digital asset securities." Paul Grewal,

*Petition for Rulemaking* 3 (July 21, 2022), https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf. In addition, in the absence of direction from the Commission, Coinbase offered two different proposals for how Coinbase could register under the existing regulatory framework. *See* Paul Grewal, *We Asked The SEC For Reasonable Crypto Rules For Americans. We Got Legal Threats Instead.*, Coinbase (Mar. 22, 2023), https://www.coinbase.com/blog/we-asked-the-sec-for-reasonable-crypto-rules-for-americans-we-got-legal. But rather than work with Coinbase to achieve registration, the Commission proceeded with this enforcement action.

The potential costs inflicted by the "ecosystem" theory could be high. Blockchain technology is being used to solve some of today's most vexing computer-science problems, such as creating resilient, redundant, and inexpensive decentralized data storage. *See, e.g.*, https://filecoin.io/store/#intro (last visited Jan. 19, 2025). But the certified decision leaves room for the Commission to label *anyone* who expends "technical … efforts," App.77a, in support of a digital asset—including software developers who merely contribute code to open-source projects on the blockchain—as securities "'issuers' or 'promoters,'" App.34a. As a

consequence, a wide range of developers could face the chilling effect resulting from the practical impossibility of creating software without a viable path to registration.  Peirce & Uyeda, *On Today's Episode*.  It is critically important that this Court address whether the "ecosystem" theory has any viability.

## CONCLUSION

This Court should grant the petition for permission to appeal under Section 1292(b).

DATED:  January 21, 2025        MUNGER, TOLLES & OLSON LLP

By: *Donald B. Verrilli, Jr.*
<span style="padding-left:2em">DONALD B. VERRILLI, JR.</span>
ELAINE J. GOLDENBERG
SARAH E. WEINER
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Sarah.Weiner@mto.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c).  The body of the petition contains 2600 words, excluding the portions exempted by rule.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in New Century Schoolbook 14-point font.

DATED:  January 21, 2025          By:   */s/ Donald B. Verrilli, Jr.*
                                                      Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2025, I caused the foregoing to be electronically served on all counsel of record via electronic mail through the Court's ACMS system. I have also submitted six paper copies to the Court via overnight delivery.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

DATED: January 21, 2025  By: */s/ Donald B. Verrilli, Jr.*
             Donald B. Verrilli, Jr.