# 25-145

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

◆◆◆

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Respondent,*

—v.—

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants-Petitioners.*

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:23-cv-4738-KPF) (Hon. Katherine Polk Failla)

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF THE PETITION FOR PERMISSION TO APPEAL**

Tara S. Morrissey
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street N.W.
Washington, DC 20062
Telephone: (202) 463-5337

Eric Tung
JONES DAY
555 South Flower Street,
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
etung@jonesday.com

Mark W. Rasmussen
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, TX 75201
Telephone: (214) 220-3939

Yaakov M. Roth
Jasmine Akre
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone: (202) 879-393

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* discloses that the Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in it.

## INTEREST OF *AMICUS CURIAE*

The Chamber of Commerce of the United States of America is the world's largest business federation.[1] It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the business community. The Chamber's members have a strong interest in regulatory clarity, and many of its members are companies subject to U.S. securities laws that may be adversely affected by the uncertainty surrounding the legal treatment of digital assets.

---

[1] Pursuant to Rule 29(a)(4)(E), *amicus curiae* states that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

# TABLE OF CONTENTS

                                                                         **Page**

CORPORATE DISCLOSURE STATEMENT ............................................................................... ii

INTEREST OF *AMICUS CURIAE* ............................................................................................. iii

TABLE OF CONTENTS ............................................................................................................ iv

TABLE OF AUTHORITIES ........................................................................................................ v

INTRODUCTION .......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

CONCLUSION .............................................................................................................................. 6

CERTIFICATE OF COMPLIANCE ............................................................................................ 8

CERTIFICATE OF SERVICE ..................................................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................................................ 5

*Coinbase, Inc. v. Sec. & Exch. Comm'n*,
    No. 23-3202, 2025 WL 78330 (3d Cir. Jan. 13, 2025) ..................................... 3

*Sec. & Exch. Comm'n v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024) .............................................................. 2

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023) .............................................................. 2

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
    684 F. Supp. 3d 170 (S.D.N.Y. 2023) .............................................................. 2

*SEC v. Coinbase*,
    No. 1:23-cv-4738 (S.D.N.Y.) ........................................................................... 4

**STATUTES**

15 U.S.C. § 78c ......................................................................................................... 1

**OTHER AUTHORITIES**

Center for Capital Markets Competitiveness, *Digital Assets: A Framework for Regulation to Maintain the United States' Status as an Innovation Leader*, U.S. Chamber of Commerce (Jan. 2021) ..................................... 3, 6

Center for Capital Markets Competitiveness, *Growth Engine*, U.S. Chamber of Commerce (Nov. 16, 2020) ......................................................... 3

Gary Gensler, Testimony Before the United States House of Representatives Committee on Financial Services, SEC (Oct. 5, 2021) .................... 6

Paul Grewal, *We Asked the SEC for Reasonable Crypto Rules for Americans. We Got Legal Threats Instead*, Coinbase (Mar. 22, 2023) .................................. 4

Kevin Helms, *Crypto Exchange Bittrex Shuts Down US Operations Due to Regulatory Uncertainty*, Bitcoin.com News (Apr. 2, 2023) ................................ 5

Olga Kharif, *SoFi Is Exiting Crypto With Banking Regulators Stepping Up Scrutiny*, Bloomberg (Nov. 29, 2023) ................................................................ 5

Jordan Major, *Ripple Has Spent 'Over $100 Million on Legal Fees Fighting SEC', the CEO Says*, Finbold (July 16, 2022) ................................................... 4

Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset Managers Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020) ........................... 5

Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"*, SEC (June 14, 2022) ............................................. 3

Hester M. Peirce, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange*, SEC (Apr. 14, 2023) ........................................................ 5

Press Release, SEC, *eToro Reaches Settlement with SEC and Will Cease Trading Activity in Nearly All Crypto Assets* (Sept. 12, 2024) ............................................ 2

Press Release, SEC, *Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges* (Feb. 9, 2023) .......................................................................... 4

Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin Adoption*, Wall Street J. (Apr. 6, 2022) ............................................................... 5

Tom Westbrook, *Global Crypto Market Tops $3 Trillion on Hopes of Trump-Fuelled Boom*, Reuters (last updated Nov. 14, 2024) ........................................ 2

Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (last updated Mar. 30, 2023), ....................................................... 5

## INTRODUCTION

For businesses to grow, they must operate under clear rules that tell them what they can or cannot do. Without such clarity, companies are left to guess and may forgo innovation for fear of guessing wrong. Such uncertainty invites, too, arbitrary enforcement by bureaucrats with the power to put companies through the regulatory ringer—or, worse, out of business altogether. That describes the state of the digital-asset industry today. District court judges, including three within this Circuit, have issued conflicting rulings on the fundamental question affecting the industry: whether digital-asset transactions in the secondary market are "investment contract[s]" under the federal securities laws. 15 U.S.C. § 78c(a)(10). No appeals court has weighed in.

This Court should. Until it does, the absence of certainty will continue to produce deleterious effects. Businesses will value risk avoidance over innovation. The cost of unpredictable enforcement actions will stymie investment. And opportunities to support economic growth in the domestic digital-asset industry will become increasingly less attractive compared to more predictable foreign markets. The financial industry, affected consumers, and the broader economy will continue to shoulder these costs.

As the district court's thorough order explains, the treatment of digital-asset transactions under federal securities laws merits this Court's review. This Court's answer, one way or the other, would bring clarity to an industry long suffering from a lack of it. This Court should grant Coinbase's petition for permission to appeal.

## ARGUMENT

Coinbase's petition for permission to appeal presents a novel legal question with weighty implications for the American economy. Digital assets have rapidly become an important segment of the financial system. Within sixteen years of the first cryptocurrency's launch, cryptocurrencies have accrued a total market value north of $3 trillion, equivalent to more than 6% of the S&P 500's market capitalization.[2] Yet despite its growing import, the digital-assets industry is plagued with regulatory uncertainty. Among the most fundamental of these uncertainties is whether and how federal securities law applies to digital-asset transactions in the secondary market.

District courts within this Circuit have split on the issue, and other Courts of Appeals have yet to take it up. *Compare Sec. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 290 (S.D.N.Y. 2024), *with Sec. & Exch. Comm'n v. Ripple Labs, Inc.,* 682 F. Supp. 3d 308, 330 (S.D.N.Y. 2023), *and Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023). The SEC's inconsistent positioning has only added to the confusion. Rather than engage with market participants to develop sensible and fair rules, the SEC has unilaterally decided without explanation that some secondary sales of digital assets are securities while others are not.[3] At the same time, it has made

---

[2] Tom Westbrook, *Global Crypto Market Tops $3 Trillion on Hopes of Trump-Fuelled Boom*, Reuters (last updated Nov. 14, 2024), https://bit.ly/40CqPQk.
[3] Press Release, SEC, *eToro Reaches Settlement with SEC and Will Cease Trading Activity in Nearly All Crypto Assets* (Sept. 12, 2024), https://www.sec.gov/newsroom/press-releases/2024-125.

vacillating public statements described by one commissioner as "confusing, unhelpful, and inconsistent,"[4] while pursuing one-off enforcement actions. *See Coinbase, Inc. v. Sec. & Exch. Comm'n*, No. 23-3202, 2025 WL 78330, at *27 (3d Cir. Jan. 13, 2025) (Bibas, J., concurring) ("The SEC repeatedly sues crypto companies for not complying with the law, yet it will not tell them how to comply").

Such uncertainty has consequences. Opaque rules make it "difficult" for businesses "to operate for fear of an enforcement action."[5] Companies must guess at whether "they are in compliance with applicable … laws, or need to be in compliance with them at all."[6] Conflicting court opinions only complicate that endeavor; companies must juggle multiple interpretations of federal law across jurisdictions and somehow predict which, if any, will control if the company is subject to an enforcement action.

This uncertainty leaves companies bearing "unacceptable risk[s]," given the high stakes associated with enforcement scrutiny.[7] Many securities violations are strict liability offenses that come with substantial penalties.[8] So companies may find

---

[4] Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"*, SEC (June 14, 2022), https://bit.ly/3VFVpVc.

[5] Center for Capital Markets Competitiveness, *Growth Engine*, U.S. Chamber of Commerce, at 74 (Nov. 16, 2020), https://bit.ly/3NKoVXO.

[6] *Id.*

[7] Center for Capital Markets Competitiveness, *Digital Assets: A Framework for Regulation to Maintain the United States' Status as an Innovation Leader*, U.S. Chamber of Commerce, at 10 (Jan. 2021), https://bit.ly/3M3h8mU.

[8] *Id.* at 54.

themselves with a choice between engaging in costly litigation defenses[9] or agreeing to onerous settlements. In one recent action, for instance, the SEC punished an asserted violation of its registration requirements not only by ordering $30 million in penalties,[10] but enjoining the company at issue "from ever offering a staking service in the United States, registered or not."

And firms have no way to meaningfully assure themselves that they can avoid the SEC's ire: Between the intra-circuit conflict, the absence of authority from other Courts of Appeals, and the SEC's failure to engage in sensible or transparent rulemaking, businesses have nowhere to turn for clear direction. Take the experience of petitioner Coinbase, for example. Coinbase dedicated considerable sums of time and money towards understanding the regulatory landscape, and repeatedly sought clarity from the SEC.[11] Rather than offer any guidance, the SEC brought the instant enforcement action.[12]

Regulatory uncertainty also chills growth and innovation. "[V]ague laws … operate to inhibit protected [conduct] by inducing citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."

---

[9] *See, e.g.*, Jordan Major, *Ripple Has Spent 'Over $100 Million on Legal Fees Fighting SEC', the CEO Says*, Finbold (July 16, 2022), https://bit.ly/41afSCB.
[10] Press Release, SEC, *Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges* (Feb. 9, 2023), https://bit.ly/416L8Cw.
[11] Paul Grewal, *We Asked the SEC for Reasonable Crypto Rules for Americans. We Got Legal Threats Instead*, Coinbase (Mar. 22, 2023), https://bit.ly/3uZ6cRu.
[12] *SEC v. Coinbase*, No. 1:23-cv-4738 (S.D.N.Y.).

4

*Buckley v. Valeo*, 424 U.S. 1, 41 n.48 (1976) (cleaned up). Many companies are forced to forgo lawful activity to avoid the risk of enforcement actions—especially in cases where compliance may be difficult or even technologically infeasible.[13] Other companies must take even more drastic steps, such as considering the possibility of relocating or refocusing abroad, abandoning U.S. operations in favor of countries with more favorable regulatory environments, or even exiting a sector entirely.[14]

This chilling effect also extends to would-be investors. Uncertainty over the legal status of digital-asset transactions in secondary markets has discouraged further investment in digital-asset endeavors and inhibited broader adoption of digital-asset products.[15] For example, a recent survey of traditional hedge funds found that almost 70% were not investing in digital assets, while almost a quarter of the firms that did invest suggested that they might reconsider their investments in the light of the American regulatory climate.[16] That hesitancy is to be expected: The specter of

---

[13] Hester M. Peirce, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange*, SEC (Apr. 14, 2023), https://bit.ly/41cTbxB.

[14] *See, e.g.*, Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (last updated Mar. 30, 2023), https://bit.ly/41aFnE0; Kevin Helms, *Crypto Exchange Bittrex Shuts Down US Operations Due to Regulatory Uncertainty*, Bitcoin.com News (Apr. 2, 2023), https://bit.ly/3NLsPQ9; Olga Kharif, *SoFi Is Exiting Crypto With Banking Regulators Stepping Up Scrutiny*, Bloomberg (Nov. 29, 2023), https://bit.ly/3Ip50tE.

[15] Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset Managers Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020), https://bit.ly/3M27eli; Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin Adoption*, Wall Street J. (Apr. 6, 2022), https://bit.ly/44BNdJt.

[16] PwC, *Rebuilding Confidence in Crypto: 5th Annual Global Crypto Hedge Fund Report*, at 4, 40 (2023), https://bit.ly/3TpqKvF.

uncertain enforcement scrutiny makes companies a riskier, less attractive investment. As the SEC has elsewhere acknowledged, and as the Chamber emphatically underscores based on its members' experiences, "[c]ompanies and investors alike … benefit from clear rules of the road."[17]

Finally, the consequences of uncertainty do not just injure businesses or investors—they undermine broader American economic and strategic interests. "[W]ith less innovation, investors have fewer opportunities for growing their retirement savings, and fewer jobs are created to drive the economy and promote growth."[18] Americans lose out on the practical benefits that products can provide, such as, in the case of the digital-asset industry, making the financial system more inclusive for the previously unbanked.[19] And continued uncertainty has implications for our nation's geopolitical interests and the continued primacy of the dollar, given the increasing relevance of digital assets to international monetary policy.[20]

## CONCLUSION

In the decade and a half since Bitcoin launched in 2009, the digital-assets industry has grown to a multi-trillion-dollar market. Yet, there is still no definitive answer on whether secondary-market sales of digital assets fall under federal securities laws. An

---

[17] Gary Gensler, Testimony Before the United States House of Representatives Committee on Financial Services, SEC (Oct. 5, 2021), https://bit.ly/42qEmII.
[18] *Digital Assets* Report, *supra* note 7, at 47–48.
[19] *Id.* at 49.
[20] *Id.* at 48.

answer to this consequential legal question, which is ripe for review, would provide much needed certainty to the American financial industry. This Court should grant Coinbase's petition for permission to appeal.

Respectfully submitted,

| | |
|---|---|
| Tara S. Morrissey<br>Kevin R. Palmer<br>U.S. CHAMBER LITIGATION CENTER<br>1615 H Street N.W.<br>Washington, DC 20062<br>Telephone: (202) 463-5337<br><br>Mark W. Rasmussen<br>JONES DAY<br>2727 North Harwood Street, Suite 500<br>Dallas, TX 75201<br>Telephone: (214) 220-3939 | /s/ *Eric Tung*<br>Eric Tung<br>JONES DAY<br>555 South Flower Street, Fiftieth Floor<br>Los Angeles, CA 90071<br>Telephone: (213) 489-3939<br>etung@jonesday.com<br><br>Yaakov M. Roth<br>Jasmine Akre<br>JONES DAY<br>51 Louisiana Avenue N.W.<br>Washington, DC 20001<br>Telephone: (202) 879-3939 |

*Counsel for Amicus Curiae*

January 21, 2025

7

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Second Circuit Rule 32.1(a)(4) because this brief contains 1,738 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure. That approximation is based on the word-count function of the word-processing program used to draft the brief.

I further certify that this brief complies with the requirements of Rule 32(a) because this brief has been prepared in 14-point font in a proportionally spaced typeface using Microsoft Word 2016.

Dated: January 21, 2025                    /s/ *Eric Tung*
                                           Eric Tung

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2025, I caused the foregoing to be electronically served on all counsel of record via electronic mail through the Court's ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: January 21, 2025

*/s/ Eric Tung*
Eric Tung